IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

GAYLE SKEETE,

*Plaintiff,*

v.

NORTH AMERICAN PARTNERS IN
ANESTHESIA, LLP, et al,

*Defendants.*

Civil Action No.: ELH-10-02704

## MEMORANDUM OPINION

Gayle Skeete, M.D., an African American female physician, sued her former employer, North American Partners in Anesthesia (Maryland), LLC ("NAPA Maryland"), as well as North American Partners in Anesthesia, LLP, which owned and operated NAPA Maryland. "Complaint" (ECF 1) ¶¶ 4-6. Plaintiff asserts that defendants (collectively, "NAPA"), illegally terminated her employment, even though she was qualified for her position as an anesthesiologist and performed her job satisfactorily. *Id.* ¶¶ 17, 19.

In particular, plaintiff alleges race discrimination in employment, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* (Count I)*, id.* ¶¶ 21-25, and 42 U.S.C. § 1981 (Count II), *id.* ¶¶ 26-30. These claims spring from plaintiff's assertion that she was "treated differently than other similarly-situated physicians not in her protected class." *Id.* ¶¶ 24, 29.[1] Plaintiff also alleges that she was subject to a racially hostile work environment, in violation of § 1981 (Count III), *id.* ¶¶ 31-38. And, plaintiff alleges breach of contract (Count IV), *id.* ¶¶ 39-41, asserting: "Defendants breached the employment agreement with Plaintiff in their assignment of work, scheduling, failing to follow procedures for her unjustified suspension,

---

[1] Plaintiff asserts that she timely filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and received a Notice of Right to Sue on July 1, 2010, within ninety days of filing her Complaint. Complaint ¶ 3.

and terminat[ion of] her employment without providing the requisite 90-days notice." *Id.* ¶ 40.

She seeks a "declaratory judgment finding that Defendants' conduct . . . violated the laws of the

United States, proscribing discriminatory practices," as well as compensatory and punitive

damages in excess of $2 million, attorney's fees, and costs. *Id.* at 8.

Defendants have moved for summary judgment ("Motion," ECF 20). Their Motion is

supported by a legal memorandum ("Motion Memo," ECF 20-1) and numerous exhibits. They

deny that plaintiff was subjected to racial discrimination, a racially hostile work environment, or

that they breached a contract, and contend that plaintiff's employment agreement was not

renewed because she was an unsatisfactory employee. Motion Memo at 1. Plaintiff opposes the

Motion ("Opposition," ECF 21), and has filed a supporting memorandum ("Opposition Memo,"

ECF 21-1), as well as several exhibits. Defendants have replied ("Reply," ECF 22). As the

matter has been fully briefed, the Court now rules pursuant to Local Rule 105.6, no hearing

being necessary.

## Factual and Procedural Background[2]

Dr. Skeete was employed by defendants as an anesthesiologist at St. Agnes Hospital in

Baltimore, Maryland. Complaint ¶ 4. She was the only African American in her "practice

group" of approximately thirteen physicians. *Id.* ¶ 8. The other physicians were Caucasian or

Asian. *Id.*

Plaintiff's employment was governed by an "Employment and 'On Track' NAPA

Practice Group Agreement" (the "Agreement"), which plaintiff signed on or about November 15,

2005. *Id.* ¶ 7; *see also* Agreement, Defendants' Exhibit 4. The Agreement provided for a two-

---

[2] The Court must construe the facts alleged in the light most favorable to plaintiff, as the non-moving party. *See United States v. Diebold*, 369 U.S. 654, 655 (1962); *accord Scott v. Harris*, 550 U.S. 372, 380 (2007).

year term of employment, *id.*, although the specific dates were "amended on several occasions." Reply at 8. Initially, the term was to run from December 5, 2005, until December 4, 2007. Complaint ¶ 7. Then, the end date was extended, first to December 18, 2007, *id.*, and later to December 29, 2007. Opposition Memo at 8; Reply at 8.[3] However, plaintiff's employment was also "subject to termination without cause or for cause." Complaint ¶ 7; *see* Defendants' Exhibit 4 at 3. The Agreement provided that it "may be terminated by either party upon ninety (90) days advance written notice." Defendants' Exhibit 4 at 7-8.

On November 30, 2007, plaintiff received a letter from Leslie Russo, "Vice President of Human Resources" for "NAPA Management Services," dated November 29, 2007, advising that defendants did not intend to renew the Agreement. Complaint ¶ 17. The letter erroneously indicated that the Agreement would expire, by its terms, on December 18, 2007, although the expiration date had been changed to December 29, 2007.[4] Plaintiff maintains that she was qualified for the position she held and performed her job satisfactorily, *id.* ¶19, while "[o]ther Caucasian and/or Asian physicians who exhibited serious job performance deficiencies received renewed agreements and were allowed to continue providing their subpar services at St. Agnes." *Id.* ¶ 18.[5] Plaintiff also complains that she was replaced by a Caucasian male physician, Dr. Gregory Cheloff. Opposition at 3.

---

[3] The copy of the Agreement included in the record, Defendants' Exhibit 4, reflects the contract expiration date of December 29, 2007. Although earlier versions of the Agreement are not included in the record, it is undisputed that there were prior versions, with other expiration dates.

[4] Excerpts of plaintiff's deposition are included as Plaintiff's Exhibit 2 and Defendants' Exhibit 1. Plaintiff testified at her deposition that she stopped working on December 18, 2007, because she believed at that time that it was "the last day of [her] contract. . . ." Defendants' Exhibit 1 at 92:11-14.

[5] In her Opposition Memo, at 2-3, plaintiff recounts what she perceived as the "serious job performance deficiencies" of some of her colleagues.

According to plaintiff, her contract was not renewed because of "[r]acial discrimination." Defendants' Exhibit 1 at 238:10-12. In her Complaint, plaintiff asserted that her supervisor, Dr. Gregory Adkisson, a Caucasian, was friendly with the Caucasian and Asian physicians, but "kept his distance" from plaintiff. Complaint ¶ 9. She also averred that he "communicated with her in a derogatory manner"; "publicly embarrassed her without cause"; and "never introduced [her] to candidates being interviewed for physician positions with Defendants." *Id.* In her Opposition Memo, at 1, plaintiff asserts that Dr. Adkisson "exhibited a certain 'discomfort' with her as compared to her Caucasian colleagues." She adds: "Dr. Adkisson did not greet or engage in any social interactions with Dr. Skeete and other African Americans; his daily interactions with them was [sic] limited to issuing orders or speaking to them in a negative and condescending manner." *Id.* at 19.

At her deposition, plaintiff testified as to Dr. Adkisson's alleged racial bias. She pointed, *inter alia,* to his "body language;" his failure to make eye contact with her; his "short," "militaristic and metered" way of talking to plaintiff; his "lack of communication" with her; his "interpersonal interaction," in which he was harsh and unfriendly; Dr. Adkisson's failure to introduce plaintiff to others; and the like. Defendants' Exhibit 1 at 119-121; 239-244.

In support of her contentions, plaintiff submitted the Affidavit of Anthony Graham, Plaintiff's Exhibit 7, an African American nurse anesthetist who previously worked with plaintiff at St. Agnes. In ¶ 2 of Mr. Graham's Affidavit, he avers:

> With African Americans, Dr. Adkisson was often negative, condescending, and extremely critical but not so with Caucasians. . . .While Dr. Adkisson routinely greeted Caucasians in the mornings and throughout the day, I never saw him greet African Americans. In fact, Dr. Adkisson was always laughing, joking, and smiling with Caucasians, while his interactions with African Americans were limited to giving us directives and orders.

In addition, plaintiff complains of other allegedly discriminatory conduct. She insists that, by late November 2006, she determined that, in comparison to her colleagues, she was disproportionately assigned to work holiday shifts. Complaint ¶ 10. By letter dated December 1, 2006 (Defendants' Exhibit 10), plaintiff communicated her concern to Dr. Sharon McLean, a senior NAPA anesthesiologist, who is Caucasian. McLean testified at her deposition that she was responsible for "mak[ing] the long-term schedules." Defendants' Exhibit 8, at 8:18.[6] Plaintiff met with Dr. McLean and Dr. Adkisson on January 18, 2007, to discuss her concerns with scheduling. But, she maintains that "they discounted her concerns." Complaint ¶ 11. According to Dr. Skeete, the "disparity in scheduling . . . persisted throughout the remainder of [her] employment with Defendants." *Id.*

Plaintiff also asserts that, on or about March 16, 2007, she was suspended by Dr. Adkisson for three days, because "she voiced her concerns about the disability of [Dr. Nagy,] a fellow doctor who continued to treat patients, thereby posing a significant risk to their health and safety." *Id.* ¶ 12.[7] According to plaintiff, the suspension "occurred in violation of established disciplinary procedures"[8] and was "humiliating." *Id.*

Further, Dr. Skeete alleges in her Complaint that her cases and surgery schedule were changed without notification to her, "in violation of established practices and procedures." *Id.* ¶

---

[6] Excerpts of Dr. McLean's deposition are included as Defendants' Exhibit 8.

[7] In her Opposition Memo, at 7, plaintiff asserts that she was never disciplined during her tenure at NAPA. No explanation is given for the discrepancy between the Complaint and the Opposition Memo.

[8] In her Opposition Memo, at 8, plaintiff outlines the disciplinary process Dr. Adkisson allegedly should have followed.

13. In contrast, she claims that her Caucasian and Asian colleagues did not have these experiences. *Id.*[9]

Defendants dispute that Dr. Adkisson was unfriendly towards plaintiff. To the contrary, they point to Dr. Adkisson's deposition testimony of June 14, 2011, in which he recounted that he had "invited Plaintiff, her father and their dog to stay at his house while their home was being repaired." Reply at 5; Exhibit 3 at 36:16-37:11.[10]

Defendants also highlight a series of plaintiff's alleged performance problems. According to defendants, Dr. Adkisson "heard many negative comments about Dr. Skeete's attitude and patient interactions." Motion Memo at 3. On February 26, 2006, for example, two operating room ("OR") nurses complained that plaintiff left the hospital "without giving report," although her patient was unstable. In the report of the OR nurses, Defendants' Exhibit 5, the nurses stated, in part:

> Dr. Skeete left and we thought she was coming back because report was never given. The patient[]…deteriorated. . . . Dr. Skeete was called . . . but we were told she had left. . . . Dr. Skeete can not [sic] leave us without giving a report and making sure the patient is stable. . . . Please advise Dr. Skeete of this practice as this is not acceptable.

In addition, on July 31, 2006, two physicians reported that, on July 28, 2006, plaintiff had ignored a request to report for an overnight surgery. *See* Defendants' Exhibit 6. The physicians wrote that Dr. Skeete was called in at 5:45 a.m., but "refused to come in during her call shift, stating that, 'by the time she would be at St. Agnes and start the case, her shift would be over and it would be time for her to leave.'" *Id.* Although the attending physician attempted to contact

---

[9] Defendants did not respond to this allegation, and plaintiff does not elaborate in her Opposition.

[10] Excerpts of Dr. Adkisson's deposition testimony are submitted as Defendants' Exhibits 3 and 16, and as Plaintiff's Exhibit 1.

plaintiff, there was "no further answer." *Id.* According to the report, the patient had to wait for surgery until "7:30 that morning when day shift anesthesia was available." *Id.*

Further, an unidentified colleague complained to Dr. Adkisson about an incident that occurred when Dr. Skeete was called into work while she was on "night call." *See* Defendants' Exhibit 7. In the report, the physician related that, upon being called, Dr. Skeete stated, "I'll be there when I get there," and took more than an hour to arrive, "twice the allowed time."[11] The report also referred to Dr. Skeete's "[i]nappropriate response time" and "[i]nappropriate attitude," and observed that this was "[n]ot the first time this has occurred."

Defendants also point to a March 2007 incident, in which Operating Room Manager Dorothy Jones complained to Dr. Adkisson about Dr. Skeete's interaction with a colleague, "OR Coordinator" Denise Howes. *See* Defendants' Exhibit 11. Jones stated that she "observed Dr. Skeet[e] communicate in a voice louder than normal range that she was not told that her patient's OR Room assignment had been changed." *Id.* According to Jones, plaintiff spoke "in a manner that did not recognize Denise as a professional, or the environment of patient care as a respectful workplace." *Id.* Further, Jones indicated that "she and [Dr. Skeete] met to discuss the preferred method of communicating professionally," speaking "for approximately 30 minutes in [Dr. Adkisson's] office." *Id.* Jones claimed that she asked Dr. Skeete "to apologize to Denise" and that the apology "was provided…the following week." *Id.*

In addition, defendants recount an incident in which the daughter of one of plaintiff's patients "complained that Dr. Skeete dismissed her mother's concerns and failed to explain a procedure adequately, causing the family unnecessary anxiety." Motion Memo at 5.

---

[11] The parties' submissions do not indicate the name of this colleague or the date of this incident. Plaintiff seemed to indicate at her deposition that the report was made by a Dr. Setya. *See* Plaintiff's Exhibit 2 at 337:4-13.

Defendants' Exhibit 13 contains a note from the patient's daughter, stating that Dr. Skeete "was very rude and short." Although defendants do not indicate when this alleged incident occurred, it appears that it occurred in April 2007.

In her Affidavit, Plaintiff's Exhibit 4, plaintiff denies altogether the factual basis of the complaint by the OR nurses; the content of the report about her alleged rude response ("I'll get there when I get there") and her delay in reporting to work; and her interaction with the patient's daughter. She also denies that Dr. Adkisson spoke to her about these incidents. *Id.* However, plaintiff does not dispute that these reports were provided to Dr. Adkisson. As to Ms. Howes, plaintiff insists it was Ms. Howes who spoke to *plaintiff* "inappropriately and moved one of her cases, causing confusion between Dr. Skeete and another surgeon." Opposition Memo at 4. She also maintains that Ms. Jones did not provide "feedback" to her regarding this incident, and insists that she did not apologize to Ms. Howes "because she had no reason to do so." Plaintiff's Exhibit 4. But, plaintiff does not dispute that she was counseled by Dr. Adkisson with respect to this incident, *see* Plaintiff's Exhibit 2 at 301:5-11, and about the incident with the overnight surgery. Opposition Memo at 4. With respect to the latter incident, plaintiff explains that she received the call to report at 5:45 a.m., and arrived at the hospital "after making the one hour commute from her home to the hospital." *Id.* However, the patient had not arrived from the emergency room by that time, so plaintiff stayed in the waiting area "until her call schedule ended at 7:00 a.m. and the day team took over." *Id.*

In their submissions, defendants did not respond to plaintiff's allegation that she was suspended after voicing concerns about Dr. Nagy endangering his patients. Nor did they respond to plaintiff's allegation that her suspension violated established disciplinary procedures. Instead, defendants maintain that plaintiff was suspended in April 2007, and not in March 2007, as

asserted by plaintiff. They explain that the suspension occurred after a nurse reported that plaintiff had been "insensitive" in dealing with an overweight obstetrics patient. Motion Memo at 4. As a result, plaintiff was "relieved of her duties for a few days to think about her approach." *Id.* In her Opposition, at 5, plaintiff concedes that she was suspended due to the incident with the obese patient, and not because she had voiced concerns about a colleague, as previously alleged.

Kathleen Anderson, a nurse, wrote a report regarding the incident involving the overweight obstetrics patient. *See* Defendants' Exhibit 12. Anderson stated that Dr. Skeete told the patient: "There is a procedure . . . I could try that would give you instant [pain] relief, but you are too big for my equipment to reach." *Id.* According to Anderson, the patient's husband complained to Anderson, stating: "[My wife] knows how large she is, I know I am big, too, and we accepted the fact that it was a problem for the Epidural to be put in place. But she is just insulting us over and over and making excuses and my wife is still in pain." *Id.* Anderson also noted that the anesthesiologist who took over at the end of Dr. Skeete's shift gave an epidural to the patient, "which gave [the patient] bilateral relief and enabled her to deliver a nine pound baby girl . . . ." *Id.*

Plaintiff asserts that she met with Dr. Adkisson about the matter on April 13, 2007, and Dr. Mary Ewing served as a witness at the meeting. Opposition Memo at 5.[12] Plaintiff observes that Dr. Adkisson "never asked [Dr. Ewing] to be [a] witness when he spoke with any other doctor." *Id.*

_____

[12] Dr. Ewing contemporaneously memorialized the substance of the meeting. *See* Defendants' Exhibit 12. She noted that Dr. Skeete "attempted to interrupt" Dr. Adkisson three times during the meeting, and stated, "I'm going to sue his ass."

At his deposition, Dr. Adkisson explained that he asked a witness to attend the meeting with Dr. Skeete because of plaintiff's "defensive nature" and because "[i]t's a fair way of getting both [parties'] concerns on the table and having an objective, uninvolved witness to the encounter so that after the fact there is no he said, she said."  Defendants' Exhibit 3 at 91:25 – 92:15.  As to the reason for the meeting, Dr. Adkisson stated, *id.* 89:18-90:7: "[Y]ou want to give the benefit of the doubt.  You want to get their side of the story because every story has two sides, sometimes three or more.  And I wanted to find out from her what her perception of the conversation was. . . ."  Further, Dr. Adkisson recounted, *id.* 90:16 - 91:3, that,

> despite the family, the nurse being very adamant about th[e] complaint, [Dr. Skeete] became very defensive, denied everything, was not willing to look at all at the perception she may have created, regardless of whether it was a true one and what had really happened.  She became very defensive and denied everything; was unwilling to consider that she played a role in this.  And we had a very unhappy family, a very unhappy patient and a very unhappy staff.

With respect to the matter of alleged inequities in the call schedule, defendants contend that Drs. Adkisson and McLean reviewed the 2006 call schedule in response to plaintiff's complaint, and found that "holiday call had been equitably distributed among the full-time anesthesiologists on staff."  Motion Memo at 4.  Moreover, defendants claim that, during a meeting about the matter with plaintiff on January 18, 2007, Adkisson and McLean offered "to share the summary of [the] holiday call schedule," but plaintiff "dismissed the findings and elected not to review the data."  *Id*.  According to Adkisson, plaintiff said "she didn't have time to look at that stuff."  Defendants' Exhibit 3 at 62:16-17.

At her deposition, plaintiff conceded that, although she complained of inequities in the scheduling, she did not compare her schedule to that of other physicians, with the exception of

Dr. Nagy.[13]  Defendants' Exhibit 1 at 210:18-211:18.  Plaintiff acknowledged that Dr. Nagy had been granted an accommodation with regard to scheduling due to a physical disability.  *Id.* Nevertheless, she seemed to disagree that Dr. Nagy needed an accommodation, insisting that "special treatment" was afforded to him "even before his stated disability."  *Id.* at 211:16-18.

A copy of the 2006 holiday schedule is included as part of Defendants' Exhibit 3.  It does not reflect that plaintiff worked more holidays than her colleagues.  But, plaintiff avers that the written schedule does not account for instances when physicians were on the schedule, but did not actually have to work.  *See* Defendants' Exhibit 1 at 210:1-5.  However, plaintiff does not address with any specificity when the schedule was not followed, by whom, or how frequently. Moreover, at her deposition she claimed that it would have been too "time-consuming" to "keep track" of such information.  *Id.* at 210:5-13.

One particular change in the schedule is addressed in detail.  On Monday, November 26, 2007, plaintiff received a call from Dr. Adkisson's secretary, Brenda Kennedy, inquiring if plaintiff was "on her way to work."  Complaint ¶ 15.  Plaintiff had worked on Thanksgiving Day, November 22, 2007, and asserts that she was scheduled to be off from Friday, November 23, 2007, through Monday, November 26, 2007.  *Id.*; *see also* Opposition Memo at 6.[14]  She

---

[13]  The following colloquy from Dr. Skeete's deposition is relevant as to plaintiff's meeting with Drs. McLean and Adkisson on January 18, 2007:

> Q: What, if anything, did you say during this meeting about discrimination?
> A: I did not say anything about discrimination.
> Q: Did you claim that you were being treated differently than others?
> A: I did not tell [Dr. Adkisson] anything about being treated differently than others.
> Q: Did you say anything about people of color being treated differently than Caucasian people?
> A: I did not say anything about Caucasians being treated any differently from people of color.

Defendants' Exhibit 1, 203:16-204:6.

[14]  Plaintiff does not specify when she checked the schedule.

explains that she "traveled to New York City for the weekend," *id.*, and communicated this information to Ms. Kennedy, but was told that "there was a 'mistake' with the schedule, and Skeete was now required to be at work on November 26, 2007." Complaint ¶ 15. Because plaintiff was not in town, she was unable to work that day. *Id.* ¶ 16.

Defendants counter that "Dr. Skeete failed to check the posted schedule and ignored several voice mail [sic] messages informing her that she was required to work on the Monday following Thanksgiving." Motion Memo at 5. Plaintiff denies receiving any such messages. Opposition Memo at 6.

Ms. Kennedy, who is Caucasian, testified at her deposition that the schedule was changed the day before Thanksgiving. Defendants' Exhibit 9 at 15:5-12. She recalled that she began phoning plaintiff and leaving messages that day to inform plaintiff of the change, *id.* at 16:6-15, and called her and left messages again on the day after Thanksgiving. *Id.* at 17:5-13. However, she did not reach Dr. Skeete until Monday, when they had the conversation Dr. Skeete recounted in her Complaint. *Id.* at 17:21-18:2.

Of import here, plaintiff was not disciplined for failing to appear at work on November 26, 2007. Opposition Memo at 7. Nor do defendants cite this incident as a reason for the decision to not renew plaintiff's employment contract.

As noted, plaintiff complains that she was replaced by Dr. Cheloff, a white, male physician. Leslie Russo, Vice President of Human Resources for "NAPA Management Services," stated in her Affidavit that, like plaintiff, Dr. Cheloff had been a NAPA employee in 2006 and 2007. Defendants' Exhibit 15 ¶ 3.[15] But, she averred that Dr. Cheloff resigned before plaintiff's employment was terminated, and he was not re-hired after plaintiff's departure. *Id.* ¶¶

---

[15] This Affidavit and four exhibits were submitted as Defendants' Exhibit 15.

4-6. He was paid by NAPA for per diem services on two dates: December 15, 2007, and December 29, 2007. *Id. ¶* 8. According to defendants, no new physicians were hired after plaintiff's departure. Reply at 4; Plaintiff's Exhibit 16 at 114:21-116:4. Documentation regarding Dr. Cheloff's employment, supportive of defendants' account, is submitted as part of Defendants' Exhibit 15.

Additional facts will be included in the Discussion.

**Discussion**

*Standard of Review*

In resolving a summary judgment motion under FED. R. CIV. P. 56, the court must view the facts, including reasonable inferences to be drawn from them, in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co.,* 475 U.S. 574, 587 (1986); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002). Summary judgment is properly granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citing former FED. R. CIV. P. 56(c)).

The party opposing summary judgment must "do more than simply show that there is some metaphysical doubt as to the material facts." *Id.*; *see also In re Apex Express Corp.*, 190 F.3d 624, 633 (4th Cir. 1999). Put another way, "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts'" showing that there is a dispute of material facts. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former FED. R. CIV. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004); *see Celotex Corp.*, 477 U.S. at 322-24.

A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). There is a genuine issue as to material fact, so as to preclude summary judgment, "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The "judge's function" in reviewing a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249.

*Counts I and II: Race Discrimination*

In general, there are "two avenues" by which a plaintiff may prove intentional employment discrimination at trial. *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004). A plaintiff can proceed on a discrimination claim by offering "'direct or indirect'" evidence of discrimination, under "'ordinary principles of proof.'" *Burns v. AAF-McQuay, Inc.*, 96 F.3d 728, 731 (4th Cir. 1996) (citation omitted), *cert. denied*, 520 U.S. 1116 (1997). "To avoid summary judgment" when proceeding under ordinary principles of proof, "'the plaintiff must produce direct evidence of a stated purpose to discriminate and/or [indirect] evidence of sufficient probative force to reflect a genuine issue of material fact.'" *Rhoads v. FDIC*, 257 F.3d 373, 391 (4th Cir. 2001) (alteration in original) (citations omitted) (internal quotation marks omitted), *cert. denied*, 535 U.S. 933 (2002).

Alternatively, a plaintiff lacking direct evidence of discrimination may proceed under what is popularly known as the *McDonnell Douglas* proof scheme.[16] *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973).[17] The *McDonnell Douglas* proof scheme is "a procedural

---

[16] Plaintiff has not alleged direct evidence of discrimination. Therefore, I will address plaintiff's claims under the burden-shifting approach of *McDonnell Douglas Corp.,* 411 U.S. 792. *See also Laber v. Harvey*, 348 F.3d 404, 432 (4th Cir. 2006).

[17] Title VII prohibits discrimination on the basis of "race, color, religion, sex, or national origin." *See* 42 U.S.C. § 2000e-2(a)(1). Section 1981 prohibits discrimination on the basis of

device, designed only to establish an order of proof and production." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 521 (1993) (emphasis omitted). *See Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 n.8 (1981) ("[T]he allocation of burdens and the creation of a presumption by the establishment of a prima facie case is intended progressively to sharpen the inquiry into the elusive factual question of intentional discrimination.").

Under the *McDonnell Douglas* approach, a plaintiff must first establish a "prima facie case" of discrimination, by a preponderance of the evidence. *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010). The precise formulation of the required prima facie showing will vary in "different factual situations." *McDonnell Douglas*, 411 U.S. at 802 n.13. But, the plaintiff is generally required to show that the employer took adverse action against an employee who was qualified for employment, "under circumstances which give rise to an inference of unlawful discrimination." *Burdine*, 450 U.S. at 253 (1981).

If the plaintiff establishes a prima facie case, "a presumption of illegal discrimination arises, and the burden of production shifts to the employer" to produce evidence of a legitimate, non-discriminatory reason for its adverse employment action or differential treatment. *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 336 (4th Cir. 2011); *see Burdine,* 450 U.S. at 253; *Merritt,* 601 F.3d 294. "If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted." *Burdine,* 450 U.S. at 255. In that circumstance, "the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant," and "simply drops out of the picture." *Hicks*, 509 U.S. at 510-11. Put another way, if the employer produces evidence that could persuade a fact finder that it had a legitimate, non-discriminatory reason for

---

race or color. *See* 42 U.S.C. § 1981(a). Plaintiff's Title VII and § 1981 claims are substantially identical. Although *McDonnell Douglas* was a Title VII case, claims of race discrimination in employment under § 1981 are analyzed under the same framework. *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 268 (4th Cir. 2005).

its actions, "the defendant has done everything that would be required of [it] if the plaintiff had properly made out a *prima facie* case," and therefore, "whether the plaintiff really did so is no longer relevant." *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983).

When the defendant meets its burden, the plaintiff must show "that the proffered reason was not the true reason for the employment decision," but was, instead, a pretext for discrimination, and that the plaintiff "has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 253, 256. *See also Adams v. Trustees of Univ. of North Carolina-Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011) ("[I]n demonstrating the Defendants' decision was pretext, [Plaintiff] had to prove '*both* that the reason was false, *and* that discrimination was the real reason.'") (quoting *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir. 1995)) (emphasis in original). If a plaintiff proves a prima facie case, and the defendant submits no evidence of any legitimate basis for its actions, the fact finder may "infer discriminatory animus because experience has proved that in the absence of any other explanation it is more likely than not that those actions were bottomed on impermissible considerations." *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 579-80 (1978).

In order to establish a prima facie case that will support a "race discrimination" claim, the plaintiff must show that she: (1) is a member of a protected class, (2) performed her job satisfactorily, (3) suffered an adverse employment action, and (4) was treated differently than similarly situated employees not within the protected class. *Coleman v. Maryland Court of Appeals,* 626 F.3d 187, 190 (4th Cir. 2010). As noted, the burden of going forward then shifts to the employer, who must articulate a legitimate, non-discriminatory reason for the differential treatment. *Burdine,* 450 U.S. at 253; *Merritt*, 601 F.3d at 294. Thereafter, the plaintiff must show that the employer's stated reason was merely a pretext for discrimination. *Burdine,* 450

U.S. at 253; *Merritt,* 601 F.3d at 294.  Under the *McDonnell Douglas* approach, the "ultimate burden of persuasion . . . never 'shifts' from the plaintiff" to prove intentional unlawful discrimination.  *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 456 n.2 (4th Cir. 1989) (citation omitted).

With respect to the first criterion, it is undisputed that, as an African American, plaintiff is a member of a protected class.  As to the third factor, concerning adverse employment action, the parties do not dispute that plaintiff "suffered adverse employment action by virtue of termination of her employment."  Opposition Memo at 10; *see also* Motion Memo at 12.

An adverse employment action is one that "'adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment.'"  *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007) (alteration in original) (quoting *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir.), *cert. denied*, 543 U.S. 959 (2004)), *cert. denied*, 552 U.S. 1102 (2008); *see also Morales-Vallellames v. Potter*, 605 F.3d 27, 36 (1st Cir. 2010) (noting that Title VII "adverse employment actions" include "a material loss in benefits" and "a less distinguished title").  When considering whether an employer's action constitutes an adverse employment action, the salient "question is whether there was a change in the terms or conditions of [the plaintiff's] employment which had a 'significant detrimental effect' on [her] opportunities for promotion or professional development."  *James*, 368 F.3d at 376 (citation omitted).  Typically, an adverse employment action has been found in cases of "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion."  *Boone v. Goldin*, 178 F.3d 253, 255 (4th Cir. 1999); *see also James*, 368 F.3d at 376.

I am mindful that plaintiff was the only African American physician in her group of thirteen medical doctors, and the only physician who suffered an adverse employment action

because her contract was not renewed. *See* Defendants' Exhibit 3, at 40:4-19. Moreover, the

facts must be construed in the light most favorable to plaintiff. *Diebold*, 369 U.S. at 655. And,

the burden on plaintiff to establish a prima facie case has been described as "relatively easy."

*See Young v. Lehman*, 748 F.2d 194, 197 (4th Cir. 1984); *Wright v. National Archives and

Records Service*, 609 F.2d 702, 713 (4th Cir. 1979). Nevertheless, plaintiff's complaints as to

racial discrimination do not withstand close scrutiny.

In regard to the fourth element of a claim for race discrimination, concerning disparate

treatment, the following deposition testimony of Dr. Skeete is noteworthy:

> Q: [W]hat did [Dr. Adkisson] do that led you to believe that the decision not to
> renew your contract was based on race?
>
> A: My performance versus Dr. Nagy's performance.
>
> Q: Anything else?
>
> A: Plain and simply my performance based against Dr. Nagy's.
>
> Q: So for you, you believe that [the] decision not to extend your contract was
> discriminatory because Dr. Nagy was granted the accommodation that he was
> granted with regard to on-call?
>
> A: It's not the accommodations. It's Dr. Nagy's overall performance as a
> practitioner and the fact that I spoke out against him going to reduced duty.
>
> ***
>
> Q: Other than your perception that your performance was better than that of Dr.
> Nagy, is there anything else that leads you to believe that your color was a
> factor in the decision not to renew your contract?
>
> A: I've stated what I think are—were the compelling factors in my case.
>
> Q: So I'll ask the question again and you need to answer it. . . .
> Other than your perception that your performance was better than that of Dr.
> Nagy, is there anything else that leads you to believe that your color was a
> factor in the decision not to renew your contract?
>
> A: No.

*Id.* 239:6-21; 241:16-242:12.

Much of defendants' focus is directed to the second criterion – satisfactory performance. Defendants assert: "Dr. Skeete has failed to meet even the *de minimus* burden of stating a *prima facie* case of discrimination because she was not satisfactorily performing her job responsibilities . . . ." Motion Memo at 7. At Dr. Adkisson's deposition, when asked why Dr. Skeete's contract was not renewed, he stated: "Well, the short version is that she was a marginal performer who had multiple complaints lodged against her by staff, family, and patients. I had more complaints regarding her than I had for the rest of my staff combined." Defendants' Exhibit 3 at 44:21-45:2. As evidence of plaintiff's unsatisfactory job performance, defendants cite, *inter alia,* the various negative reports about plaintiff, discussed earlier, such as those of the OR nurses; plaintiff's delay in responding to a work call; as well as plaintiff's interaction with the obese obstetrics patient. *Id.* at 8-9. NAPA maintains that, "[a]s a result of these incidents, Dr. Skeete became widely-known by the St. Agnes staff as a difficult and unprofessional colleague." *Id.* at 9.

To be sure, plaintiff vigorously contends that she presented credible evidence establishing her competence and that the quality of her performance was satisfactory. Opposition Memo at 10, 14. For example, with regard to the obese obstetrical patient whom plaintiff allegedly treated "insensitively," plaintiff asserts: "There is no evidence that the patient's health care was compromised in any respect or that [the patient] was in danger at any time during her interaction with Dr. Skeete." *Id.* at 12. She adds that "Dr. Adkisson acknowledged that as part of the inform-consent [sic] process, it was appropriate for Skeete to discuss factors unique to the patient's body size." *Id.* Dr. Skeete also points out that she "was never disciplined for her work performance and/or conduct, as set forth in the Physician Handbook," and that she "never

received a performance appraisal." *Id.* at 11. Alternatively, plaintiff maintains that there is a genuine dispute of fact regarding the alleged deficiencies in her performance. *Id.* at 14.

Yet, as discussed, *supra*, plaintiff does not deny that Dr. Adkisson received multiple negative reports about her. Even assuming that the complaints about plaintiff were unfounded or without merit, and that plaintiff's performance was satisfactory and comparable to that of the other physicians, defendants have offered a legitimate, non-discriminatory reason for non-renewal of her contract: "NAPA did not offer to extend [plaintiff's] employment contract" because of concerns as to "patient care issues, colleague complaints and Dr. Adkisson's overall assessment of Dr. Skeete's contribution to the department." Motion Memo at 5.

In order to rebut the defense's proffer of a legitimate, non-discriminatory reason for the adverse employment action, plaintiff cannot merely insist that her performance was satisfactory, and posit that defendants' assessment of her performance was erroneous. She must show that defendants' assessment was a pretext for racial discrimination. Plaintiff has failed to do so. *See, e.g., Borders v. Policy Studies, Inc.,* No. RDB-07-638, 2008 WL 3200725, at *6 (D. Md. Aug. 5, 2008) (merely disputing the basis of the employer's decision, without presenting evidence of pretext, is insufficient to survive summary judgment). Notably, plaintiff does not suggest that the persons who complained about her deliberately fabricated the incidents described earlier. It is also undisputed that these incidents were the subject of several negative reports communicated to Dr. Adkisson.

In plaintiff's view, she was disciplined only because of concerns about her "attitude," and not her performance as a physician. Opposition Memo at 13. Even if the complaints pertained only to plaintiff's attitude, demeanor, or lack of collegiality, and not to her medical competence, the Fourth Circuit has recognized, albeit in another context, that "staff cooperation and

communication are essential to ensuring a high quality of patient care. Disruptive behavior in the workplace can not only affect the morale and teamwork of the staff itself, but in so doing cause actual harm to patients." *Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205, 219 (4th Cir. 2002) (rejecting plaintiff's contention that Maryland's credentialing regulation violated due process because it permits administrators to deny hospital privileges based on a so-called "attitude criterion"). *Cf. University of Baltimore v. Iz*, 123 Md. App. 135, 165, 716 A.2d 1107, 1122 (holding, in a breach of contract action, that collegiality is an appropriate consideration for tenure and promotion even when not specifically listed as a criterion in the contract, because "collegiality plays an essential role in . . . service"), *cert. denied*, 351 Md. 663, 719 A.2d 1262 (1998).

The evidence outlined above indicates that defendants had ample documentation of plaintiff's arguably unprofessional and abrasive manner and lack of collegiality. Colleagues and patients described plaintiff's behavior as "not acceptable," "inappropriate," "insulting," and "rude and short." Although such comments may not impugn Dr. Skeete's medical competence, they would justify a decision not to renew her contract.

"When an employer gives a legitimate, nondiscriminatory reason for an employment action," such as the several complaints made known to defendants about plaintiff, "it is not the province of the Court 'to decide whether the reason [for terminating employment] was wise, fair, or even correct, ultimately, so long as it truly was the reason' for the employment action." *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir.1998) (citation omitted). Put another way, an employee's assertion that he or she performed adequately, or a disagreement with the employer's judgment, is not evidence of pretext. *See, e.g., Hawkins v. PepsiCo, Inc.,* 203 F.3d 274, 278-79 (4th Cir. 2000) (affirming district court's dismissal of plaintiff's employment

discrimination claim; although plaintiff disputed her supervisor's assessment of her performance, she did not establish pretext, because "'it is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff'" (citation omitted)); *Bernstein v. St. Paul Companies, Inc.*, 134 F. Supp. 2d 730, 739 (D. Md. 2001) ("While [plaintiff] denies that his interpersonal skills were weak and considers himself better qualified than [his competitor], his own personal assessment is irrelevant. An employee's personal view that he is qualified for a position or better qualified than another candidate is, under Fourth Circuit law, irrelevant and insufficient to establish pretext.").

In an effort to show that the complaints about her were pretextual, plaintiff outlines deficiencies in the medical performance of other physicians in her group, who are not African American, and for whom contracts were renewed. Opposition Memo at 2-3. Yet, plaintiff does not allege that any of her colleagues had "patient care issues"[18] or were the subject of "colleague complaints." Motion Memo at 5. *See, e.g., Ike-Ezunagu v. Deco, Inc.,* No. RWT 09cv526, 2011 WL 1485277, at *3 (D. Md. Apr. 18, 2011) (Plaintiff "has presented the Court with no evidence that employees outside of her protected class were retained after abandoning their posts, not reporting for work, and failing to attend meetings, as [plaintiff] did."); *Simmons v. Shalala*, 946 F.Supp. 415 (D. Md. 1996) ("[T]hese other employees are not legally sufficient comparators. . . . Plaintiff would have to show that a white employee was accused of comparably serious offenses to those Plaintiff was accused of, and was not terminated, in order to raise an inference that race was a determining factor in the employer's decision."). Further, a plaintiff's "unsubstantiated allegations and bald assertions concerning her own qualifications and the shortcomings of her co-workers fail to disprove [the defendant's] explanation or show discrimination." *Evans v.*

---

[18] In the context of defendants' arguments, it is clear that "patient care issues" is a reference to Dr. Skeete's "bedside manner," not her performance as an anesthesiologist.

*Technologies Applications & Service Co.*, 80 F.3d 954, 960 (4th Cir. 1996) (affirming the trial court's grant of summary judgment to a defendant in a Title VII failure to promote case because "[plaintiff's] evidence falls far short of that needed to overcome summary judgment.").

Moreover, the Affidavit of Anthony Graham, a former nurse anesthetist at St. Agnes, does not suggest that NAPA's stated reasons for dismissing Dr. Skeete were pretextual. In his Affidavit, Plaintiff's Exhibit 7, Graham notes that Dr. Adkisson once "berated" him for being late, in front of "patients and other nurses," yet Graham "never heard [Dr. Adkisson] say anything to [a white female who was repeatedly late] about her tardiness." *Id. ¶* 3. He also states that on one occasion Dr. Adkisson criticized Graham and two other African Americans for "standing around and talking," but Graham never saw Dr. Adkisson criticize Caucasian staff members for doing the same thing on other occasions. *Id.* ¶ 4. And, Graham avers that once Dr. Adkisson wrote a comment on an article Graham had been reading about Barack Obama, "questioning why [he] was reading such an article and calling the article 'garbage.'" *Id.* ¶ 5. Graham insists that Dr. Adkisson "would have never taken the same approach with a Caucasian member of staff, regardless of political orientation." *Id.* According to Graham, these incidents evince that Dr. Adkisson had "a slave owner's mentality." *Id.* ¶ 6.

Mr. Graham's allegations do not reflect racial bias *towards plaintiff*. That Graham was unaware of Dr. Adkisson criticizing Caucasian co-workers for engaging in the same conduct for which he criticized Graham and two other African-Americans does not demonstrate that Dr. Adkisson did not, in fact, criticize those co-workers. Nor do such allegations show that Dr. Adkisson's criticism of Graham, or his issues with plaintiff, were unfounded or racially motivated. Similarly, Dr. Adkisson's negative feelings regarding an article about President

Obama do not prove his racial bias. And, Graham's assertion that Dr. Adkisson "would have never taken the same approach with a Caucasian member of staff" is wholly speculative.

Nor does Dr. Adkisson's alleged harsh, rude manner or unfriendliness towards plaintiff establish racial animus. Personality conflicts are

> an inevitable byproduct of the rough edges and foibles that individuals bring to the table of their interactions. Law does not blindly ascribe to race all personal conflicts between individuals of different races. To do so would turn the workplace into a litigious cauldron of racial suspicion. Instead, legally sufficient evidence is required to transform an ordinary conflict . . . into an actionable claim of discrimination.

*Hawkins,* 203 F.3d at 282 (finding no evidence of racial animus on the part of a Caucasian supervisor who was "tough" and "demanding," required his African American employee "to redo documents and work late," was "often unreceptive to her ideas," and offered criticism that was "blunt and even at times unfair."). *See also Darvishian v. Geren,* 404 F. App'x 822 (4th Cir. 2010) ("[W]hile the . . . evidence . . . supports an inference that [plaintiff's supervisor] disliked [plaintiff] personally, this evidence does not establish a link between her personal dislike of [plaintiff] and his membership in a protected class.").

As evidence that her discharge was racially motivated, plaintiff points to her claim that NAPA hired a replacement who is not African American. Opposition at 3. She asserts, *id.* at 18:

> It is apparent that Defendants wanted to get rid [of] Dr. Skeete quickly after they were able to recruit Dr. Gregory Cheloff to fill her position . . . . It was apparent that Dr. Adkisson did not want African Americans working on the contract with him, and he tolerated those whom he was forced to hire to fulfill contract requirements until he could fill those positions with Caucasians.

As indicated, however, the unrefuted evidence establishes that Dr. Cheloff was not hired to replace plaintiff. Dr. Cheloff worked only two days, on a per diem basis. Indeed, no new physicians were hired after plaintiff's departure.

It is also not evidence of pretext, as plaintiff asserts in her Opposition Memo, that Dr. Adkisson "never provided [plaintiff] with a three month appraisal or an annual appraisal on the anniversary of each of the two years [plaintiff] worked at NAPA," as required by the "Physician Employee Handbook." Opposition Memo at 7. Although plaintiff suggests that the lack of appraisals indicates that concerns about her performance were concocted "after-the-fact," *id.* at 11, it is undisputed that plaintiff was aware that Dr. Adkisson was dissatisfied with her performance. In any event, plaintiff does not allege that appraisals were provided to physicians who are not African American. And, although plaintiff asserts that, at the time of the various incidents, she was unaware of Dr. Adkisson's dissatisfaction with her performance, she does not dispute that the incidents were, indeed, reported to Dr. Adkisson.

Nor can pretext be gleaned from plaintiff's remaining allegations regarding differential treatment. For example, plaintiff contends that her surgery schedule was changed without prior notification to her, while her Caucasian co-workers did not experience this problem. Complaint ¶ 13. But, her assertions lack specificity. In any event, this allegation does not pertain to the veracity of the non-discriminatory reasons proffered by defendants as the basis for the non-renewal of plaintiff's employment agreement. Similarly, the deposition testimony of Drs. Adkisson and McLean, as well as the call schedule itself, Defendants' Exhibit 3, reflect that holiday calls were not disproportionately assigned to Dr. Skeete, let alone that they were disproportionately assigned to Dr. Skeete because she is African American.[19]

It is also not evidence of pretext that Dr. Adkisson asked for a "witness" to sit in during his meeting with plaintiff, at which he discussed her treatment of the obese obstetrical patient,

---

[19] Although Dr. Skeete raised holiday scheduling as an issue in her Complaint, she appears to have abandoned the issue, as it is not mentioned in her Opposition Memo. In any event, these allegations do not refute the non-discriminatory reasons proffered by defendants as the basis for the non-renewal of plaintiff's employment contract.

even though Dr. Adkisson apparently did not routinely request "witnesses" in meetings with plaintiff's colleagues. Opposition Memo at 5. Plaintiff concedes that her "attitude" was the subject of the meeting, Opposition Memo at 13, and Dr. Adkisson believed that plaintiff was known to be "difficult." Motion Memo at 9.

In sum, even assuming, *arguendo*, that plaintiff could establish a prima facie case, no reasonable jury could find that defendants' professed reason for discharging plaintiff was pretextual.[20] Accordingly, defendants are entitled to summary judgment as to Counts I and II.

*Count III: Hostile Work Environment*

A claim of hostile work environment is premised on the notion that "an employee's work environment is a term or condition of employment." *EEOC v. Central Wholesalers, Inc.*, 573 F.3d 167, 174 (4th Cir. 2009) (internal citations and quotation marks omitted). "To survive summary judgment on a claim of a racially hostile work environment," a plaintiff must provide evidence of harassment by her co-workers, which a reasonable jury could find was "'(1) unwelcome; (2) based on race; and (3) sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere,'" and must also show "'that there is some basis for imposing liability' for the harassment on the employer." *EEOC v. Xerxes Corp.*, 639 F.3d 658, 668 (4th Cir. 2011) (quoting *Spriggs v. Diamond Auto Glass*, 242 F.3d 179,

---

[20] Defendants argue that, because the "same actor" made the decision to both hire and fire plaintiff, this generates the inference that discrimination was not the motive. Motion Memo at 9. *See Proud v. Stone*, 945 F.2d 796, 797 (4th Cir. 1991) ("[I]n cases where the hirer and the firer are the same individual and the termination of employment occurs within a relatively short time span following the hiring, a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer."). Plaintiff claims that the inference is not appropriate here because, "[w]hen Dr. Skeete applied for one of three vacant physician positions with NAPA, Dr. Adkisson was desperate for help and was looking at 'almost any lead' to hire to fulfill staffing requirements on NAPA's contract with St. Agnes." Opposition Memo at 1. She also insists that, given the period of two years between her "hiring" and "firing," the events did not occur within a "relatively short time span." *Id.* at 15. Based on my resolution of Counts I and II, I need not address this argument.

183-84 (4th Cir. 2001)). *See also Hoyle,* 650 F.3d at 331; *Okoli v. City of Baltimore,* 648 F.3d 216, 220 (4th Cir. 2011); *Bonds v. Leavitt*, 629 F.3d 369, 385 (4th Cir. 2011). The abusive or "hostile" work environment must be objectively hostile, not merely subjectively so. *See Bonds*, 629 F.3d at 385 (citing *E.E.O.C. v. Sunbelt Rentals, Inc.,* 521 F.3d 306, 315 (4th Cir.2008)).

In making the determination of whether a work environment is objectively hostile, several factors are relevant, including "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Bonds*, 629 F.3d at 385 (citation and internal quotation marks omitted). Liability may be imputed to the employer if it "'knew or should have known about the harassment and failed to take effective action to stop it'" or failed to "'respond with remedial action reasonably calculated to end the harassment.'" *Xerxes Corp.*, 639 F.3d at 669 (internal citations omitted). "'The institution and enforcement of [an anti-harassment] policy, in conjunction with an adequate complaint procedure, aid the employer in establishing that it has exercised reasonable care to prevent discrimination[,]'" so long as the policy is effective and administered in good faith. *Id.* (internal citations omitted).

Plaintiff cannot establish a prima facie case of discrimination in support of her hostile work environment claim. She cannot show that she was the victim of unwelcome harassment, that any perceived harassment was due to her race, or that it rose to the level of being severe and pervasive.

As evidence of a hostile work environment, plaintiff cites Dr. Adkisson's allegedly frosty demeanor. However, an unfriendly supervisor does not amount to a hostile work environment. *See, e.g., Sunbelt Rentals, Inc.,* 521 F.3d at 315-316 (holding that "complaints premised on nothing more than 'rude treatment by [coworkers],' 'callous behavior by [one's] superiors,' or 'a

routine difference of opinion and personality conflict with [one's] supervisor,' are not actionable under Title VII" (internal citations omitted)); *Baqir v. Principi,* 434 F.3d 733, 747 (4th Cir. 2006) (stating that rude treatment by supervisors is "conduct falling short of that required to sustain a hostile work environment claim"); *Bradington v. Int'l Business Machines Corp.,* 360 F.Supp. 845, 854 (D. Md. 1973) (stating that a "personality conflict" between plaintiff and supervisor "generated antipathy and professional incompatibility which might have made it more difficult for the plaintiff to perform. But this certainly does not translate into discrimination. An employer is not required to like his employees."), *aff'd,* 492 F.2d 1240 (4th Cir. 1974).

As discussed previously, there is no evidence that Dr. Adkisson's alleged unfriendliness towards plaintiff was due to racial animus. *See, e.g., Combs-Burge v. Rumsfeld*, 170 Fed. Appx. 856, 862 (4th Cir. 2006) ("[A]lthough [plaintiff] alleges that [her supervisor] was more friendly to white employees than to her, general complaints of rude treatment are not sufficient to sustain a hostile work environment claim."). Moreover, Dr. Adkisson's alleged unfriendliness cannot automatically be considered racially motivated simply because he is Caucasian and plaintiff is African American. *Hawkins,* 203 F.3d at 282 ("Law does not blindly ascribe to race all personal conflicts between individuals of different races.").

Plaintiff has not put forth any evidence of racially discriminatory harassment, let alone harassment so "severe or pervasive" as to create a hostile work environment. Because no reasonable jury could find that plaintiff was the victim of a hostile work environment, summary judgment as to Count III is granted to the defendants.[21]

---

[21] As I find that plaintiff did not suffer a hostile work environment, I need not address whether there is a basis for imputing liability to plaintiff's employer for any perceived discriminatory harassment.

*Count IV: Breach of Contract*

Plaintiff contends in her Complaint, at ¶ 40, as follows:

> Defendants breached the employment agreement with Plaintiff in their assignment of work, scheduling, failing to follow procedures for her unjustified suspension, and terminat[ion of] her employment without providing the requisite 90-days notice.

As defendants observe, plaintiff failed to point to any contractual provision that defendants breached "with respect to work assignments, scheduling and disciplinary procedures." Motion Memo at 15. Defendants also correctly observe that "the Agreement does not set forth any guidelines or policies with respect to work assignments, scheduling and/or disciplinary action." *Id.* at 16. Nor does plaintiff address these concerns. Rather, in her Opposition Memo, at 20, she reiterates that defendants breached the Agreement in failing to provide her with ninety days' notice before terminating her employment. In particular, defendants told plaintiff that her employment would end on December 18, 2007, yet the Agreement did not expire until December 29, 2007. Opposition Memo at 8. Therefore, she claims that she was entitled to ninety days' notice under the terms of the Agreement.

The Agreement provided for a two year term of employment. Complaint ¶ 7. The specific dates were "amended on several occasions." Reply at 8. Initially, the term was to run from December 5, 2005, until December 4, 2007. Complaint ¶ 7. But, the end date was later extended to December 18, 2007, *id.*, and then it was extended again, to December 29, 2007. Opposition Memo at 8; Reply at 8. Plaintiff herself exhibits confusion about the end date, stating in her Complaint, at ¶ 7, that it was December 18, 2007:

> The Agreement provided for an initial term of full-time employment commencing on December 5, 2005 until the end of the business day on December 4, 2007 and later extended to December 18, 2007.

*See also* Defendants' Exhibit 1, 92:11-14.

Defendants assert, and plaintiff does not dispute, that the Agreement "did not require notice of either party's intent not to renew the Agreement," but would require notice "in the event either party sought to terminate the agreement" prior to its expiration date. Motion Memo at 15-16. Defendants explain that they simply made a clerical error as to the expiration date of the Agreement. *Id.* at 16. And, they have since compensated plaintiff for the last two weeks of work at issue. *Id.*

Plaintiff concedes that defendants "sent her a check to cover her wages for the last two weeks of her contract." Opposition Memo at 20. But, she insists that she is still owed "approximately $10,000 for the last quarterly employer contribution to her 401(k) plan." *Id.* Defendants respond: "Not only did Plaintiff never include such a claim or allegation in her Complaint, she also fails to identify any contractual obligation to make such a contribution." Reply at 10.

In Maryland,[22] in order to prevail on a breach of contract claim, a plaintiff must show the existence of a contractual obligation, breach, and damages. *Kumar v. Dhanda*, 198 Md.App. 337, 345, 17 A.3d 744, 749 (2011). Plaintiff has not put forth any evidence of damages resulting from defendants' nominal breach. To the extent that plaintiff was damaged by any breach, she has been made whole, and her claim is moot.[23] Accordingly, summary judgment as to Count IV is hereby granted to the defendants.

---

[22] The Agreement states that it "shall be governed by, and construed in accordance with, the laws of the State of Maryland." Defendants' Exhibit 4.

[23] A plaintiff "is bound by the allegations contained in [her] complaint and cannot, through the use of motion briefs, amend the complaint." *Zachair Ltd. v. Driggs*, 965 F. Supp. 741, 748 n. 4 (D. Md. 1997). Even if, *arguendo*, plaintiff is owed money for her 401(k) plan based on the discrepancy in the end date of the Agreement, plaintiff does not explain her claim for $10,000. I agree with defendants that an amendment at this point to recover for this contribution would be "both untimely and prejudicial." Reply at 10.

**Conclusion**

For the foregoing reasons, the Court will grant the motion for summary judgment of defendants North American Partners in Anesthesia (Maryland), LLC and North American Partners in Anesthesia, LLP.   A separate Order consistent with this Memorandum Opinion follows.


Date:  January 4, 2012                                              _____/s/_____

                                                                                    Ellen Lipton Hollander
                                                                                    United States District Judge